Jason P. Kathman
State Bar No. 24070036
Melanie P. Goolsby
State Bar No. 24059841
PRONSKE GOOLSBY & KATHMAN, P.C.
2701 Dallas Pkwy, Suite 590
Plano, Texas 75903
(214) 658-6500 - Telephone
(214) 658-6509 – Telecopier
Email: jkathman@pgkpc.com
Email: mgoolsby@pgkpc.com

**PROPOSED COUNSEL FOR DEBTOR**
**AND DEBTOR IN POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 18-32070-SGJ-11** |
| **FULCRUM EXPLORATION, LLC** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |

### DECLARATION OF DEREK JENSEN IN SUPPORT OF DEBTOR'S
### CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF

I, Derek Jensen, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I am the President and a Manager of Fulcrum Exploration, LLC ("**Fulcrum**" or "**Debtor**") and I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.

2.    I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of the (i) Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on June 24, 2018 (the "**Petition Date**") and (ii) the relief, in the form of motions and applications, that the Debtor has requested of the

Court (the "**First Day Pleadings**").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other employees and representatives of the Debtor, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

4.      This Declaration is intended to provide a summary overview of the Debtor's business and this chapter 11 case. Sections I through III provide a description of the Debtor's business, history and organizational structure, prepetition indebtedness, and the circumstances giving rise to the commencement of this chapter 11 case. Part IV summarizes the First Day Pleadings and the relief they seek, which the Debtor believes are crucial to its successful reorganization.

## I.      THE DEBTOR

5.      Fulcrum is a privately-owned oil and gas exploration, development and production company headquartered in Flower Mound, Texas. The Debtor owns operating working interests in approximately 75 wells in southwest Oklahoma, primarily in Jackson and Tillman counties, as well as certain personal property (together, the "**Debtor's Assets**").

6.      The Debtor is a Texas limited liability company, formed in August of 2006 to own and operate oil and gas wells in southwest Oklahoma, and is the successor in interest, via merger, of CanAm Oil & Gas, LP ("**CanAm**").

7.      On or about September 20, 2016, Fulcrum and CanAm filed with the Texas Secretary of State their Certificate of Merger outlining the applicable disclosures and information

related to the merger of the two entities (the "**Merger**"). Prior to the Merger, Fulcrum was owned by fourteen (14) individuals or entities, none of which owned more than 25% of the equity interest. CanAm was a Texas limited partnership whose general partner was Fulcrum and whose sole limited partner was Louis Ouellete ("**Ouellette**"). After the Merger, Fulcrum is now owned 45% by Ouellette, and 55% by the members who previously owned 100% of the interests in Fulcrum prior to the Merger.

8.      Prior to the Merger, CanAm owned approximately 45 wells that were operated by Fulcrum. Fulcrum owned approximately 25 wells that it operated. After the Merger, the Debtor's operating agreement provides that the members' share of profit and loss is calculated based upon the profit and loss of the "Pre-Merger CanAm Wells" and "Pre-Merger Fulcrum Wells" (*i.e.,* the wells that were owned by the respective entities prior to the Petition date).

9.      The Debtor's oil and gas properties encompass approximately 4,000 acres in Jackson and Tillman counties, Oklahoma. The Debtor is the operator on all of the wells it owns working interests in. As of December 2017, the Debtor had total estimated proved reserves[1] of 1,703 MBbls.[2] The reserves can further be classified and characterized as follows: 704 MBbls were

---

[1] Reserve figures are broken into two primary categories according to theoretical accuracy: proved and unproved. "Proved" reserves means the estimated quantities of crude oil, natural gas, or natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. "Unproved" reserves carry more uncertainty, and are further broken into "probable" reserves and "possible" reserves.

[2] "Bbl" stands for Barrels of Oil. "MBbl" stands for One Thousand Barrels of Oil.

PDP,[3] 297 MBbl were PDNP,[4] and 701 MBbls were PUDs.[5] In addition to these reserves, the Debtor has under lease a significant amount of land for which geological studies have been completed, but the engineering and reserve reports have not yet been completed. Thus, in addition to the reserves described herein, there is likely a significant amount additional reserves that are not represented in the Debtor's December reserve report.

10.     Like many E&P companies, in addition to bank financing (discussed below), the Debtor defrays part of the costs of drilling new wells by entering into agreements with other E&P companies and individuals (the "**Drilling Partners**"). In its most recent drilling campaign, the Debtor offered 50% working interests in the wells to be drilled for 100% of the drilling costs.

11.     Recently, Fulcrum completed and brought online three new wells (the "**Walls # 8**", "**Walls #9**", and "**Walls #10**", collectively, the "**New Walls Wells**"), each of which Fulcrum estimates will produce approximately 10-15 Bbls of oil per day. Utilizing current NYMEX strip pricing, Fulcrum estimates that the New Walls Wells will provide, approximately $35,000 - $40,000 per month in additional cash flow. In addition to adding the additional cash flow, the New Walls Wells will provide confidence for the Debtor's Drilling Partners to invest additional capital to continue the Debtor's drilling program.

## II.     PREPETITION INDEBTEDNESS

12.     Like many other E&P companies, prior to the Petition Date, the Debtor financed its

---

[3] "Proved developed producing" or "PDPs" means reserves that are expected to be recovered from through existing wells with existing equipment and operating methods.

[4] "Proved developed not producing" or "PDNPs" means reserves that are expected to be recovered from existing wells that are completed but are not producing (shut-in) or wells to be completed that are behind existing wells (behind pipe).
[5] "Proved undeveloped reserves" or "PUDs" means reserves that are expected to be recovered from new wells drilled to a known reservoir(s) on un-drilled acreage or from existing wells where a relatively major expenditure is required from recompletion.

operations through the use of a reserve-based line of credit. On or about October 7, 2011, Fulcrum entered into a Loan Agreement (the "**Prepetition Loan Agreement**", and together with all other documents, instruments, and agreements delivered in connection with the Prepetition Loan Agreement, as amended and in effect as of the Petition Date, the "**Prepetition Loan Documents**") with Sovereign Bank ("**Sovereign**"). Sovereign subsequently merged with Veritex Bank ("**Veritex**", and as the successor in interest to Sovereign, the "**Prepetition Secured Lender**"). The Credit Agreement provides for a loan in the maximum principal amount of $20,000,000 to the Debtor, on the terms set forth in the Revolving Promissory Note (the "**Note**"). The terms of the Prepetition Loan Agreement and Note further provide that the principal outstanding at any time shall not exceed the lower of (i) the aggregate sum permitted under the "Borrowing Base" (which was set at $8,150,000 as of September 15, 2016, or (ii) $20,000,000.

13.     Pursuant to the Prepetition Credit Agreement, the Debtor granted liens on substantially all of its assets. Additionally, and in conjunction with the Prepetition Credit Agreement, the Debtor also executed that certain Mortgage and Security Agreement (the "**Prepetition Mortgage**") related to certain of the Debtor's oil and gas properties in Jackson and Tillman County, Oklahoma, to secure the prepetition obligations set forth in the Prepetition Loan Documents (collectively with the liens granted pursuant to the Prepetition Credit Agreement, the "**Prepetition Collateral**").

14.     Since its execution, the Prepetition Credit Agreement has been amended multiple times, such that on the Petition Date the "Borrowing Base" was $6,690,000. As of the Petition Date, Fulcrum owed approximately $8.2 Million on the Note.

### III.     KEY EVENTS LEADING TO DEBTOR'S CHAPTER 11 FILING

15.     Like many other E&P companies, the dramatic decline in oil and gas prices had a

significant impact on Fulcrum and its operations. More specifically, the decline in oil and gas prices made drilling new wells uneconomic. Further, the decline in the oil and gas prices led to a decline in the value of the Debtor's oil and gas reserves, which in turn led to a decrease in their borrowing base and availability on their reserve-based line of credit with their lender. Without availability to capital, the Debtor was forced to put some of its new drilling operations on hold, which further complicated and impacted the valuation of the Debtor's reserves.

16.     In an attempt to offset the economic effects on the reserve report (*i.e.*, no new production because no new wells), the Debtor drilled a number of new wells in 2016. One of those wells was the CanAm 2-1. The CanAm 2-1 was drilled between two of Fulcrum's other wells that were consistent producers and positioned to take advantage of Fulcrum's saltwater injection system. The CanAm 2-1 was completed in October 2016 and initially produced 80-90 Bbls of oil per day. However, in March of 2017, production on the CanAm 2-1 began to drop-off and Fulcrum began to notice complications with the surrounding wells also. Over the next six to eight months, Fulcrum worked to analyze these complication, eventually stabilizing the CanAm 2-1 and surrounding wells in October 2017. The complications related to the CanAm 2-1 had a negative impact on the December 2017 reserve report.

17.     The December 2017 reserve report caused a meeting to occur in early January 2018 between Fulcrum's management and Veritex. At the meeting, Veritex asserted that there was a borrowing base deficiency in the amount of $1,535,000.00. At Veritex's request, the parties modified the September 1, 2018 maturity date of the Note, to May 1, 2018 (the "**Fifth Amendment to Loan Agreement**"). The Fifth Amendment to Loan Agreement also added an additional requirement that Fulcrum was required remit 100% of its "Excess Cash Flow" for payment towards the balance on the Note.

18.     On May 2, 2018, the Prepetition Secured Lender made demand for payment of the Note (the "**May 2 Demand Letter**"). Partially in response to the May 2 Demand Letter, the Debtor and the Prepetition Secured Lender met and negotiated a forbearance (the "**Prepetition Forbearance Agreement**"). The Prepetition Forbearance Agreement required, among other things, that the Debtor pay $300,000 as a principal pay down by June 23, 2018, and another approximately $85,000 in accrued interest by June 25, 2018. Instead of making the $385,000 of payments, the Debtor's chose to preserve its capital and filed this case.

## IV.     SUMMARY OF FIRST DAY PLEADINGS

19.     Concurrently with the filings of the voluntary petition, the Debtor has filed, for the Court's approval, a number of First Day Pleadings, which the Debtor believes are necessary to enable it to operate in chapter 11 with a minimum of disruption and loss of productivity.  The Debtor respectfully requests that the each of the First Day Pleadings be granted, as they are a critical element to facilitating the Debtor's smooth and orderly operations with minimal disruption during the pendency of its chapter 11 case.  A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

### A.     Cash Collateral Motion

20.     The Debtor's *Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Pre-petition Secured Lender* (the "**CC Motion**") seeks the entry of an interim order, substantially in the form attached to the CC Motion (the "**Interim CC Order**") (i) authorizing the Debtor to use cash collateral (as defined in section 363(a) of the Bankruptcy Code, ("**Cash Collateral**") pursuant to the terms specified in the Interim CC Order and Final CC Order attached to the CC

Motion; (ii) granting adequate protection to the Prepetition Secured Lender; (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim CC Order; and (iv) scheduling a final hearing to consider the relief requested in the Motion on a final basis and the entry of a final order (the "**Final CC Order**", and together with the Interim Order, the "**CC Order**") approving the relief requested in the CC Motion.

21.     As described and explained above, prior to the Petition Date, the Debtor financed its operation through the use of a reserve-based line of credit. The Debtor projects that it will continue to need the liquidity that was provided by the prepetition reserve-based line of credit to fund its operations and pay the costs and expenses of administering the chapter 11 case.

22.     The Debtor intends to work with the Prepetition Secured Lender to negotiate an agreement on the use of cash collateral on a consensual basis, including providing adequate protection in the form of adequate protection liens and periodic adequate protection payments.

**B.     Royalty Payment Motion**

23.     Pursuant to the Debtor's Emergency Motion for Interim and Final Orders Authorizing Debtor-in-Possession to Pay or Honor Prepetition and Post-Petition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Gas Leases (the "**Royalty Motion**"), the Debtor seeks interim and final orders: (a) authorizing the Debtor to pay or honor prepetition and post-petition royalty obligations, working interest obligations and other obligations related to oil and gas leases, and (b) scheduling a final hearing to consider entry of the Final Order, to the extent necessary.

24.     The Debtor owns interests in certain oil and gas Leases, which obligate it to remit Royalties to the Royalty Interest Owners for their share of the proceeds from the sale of

hydrocarbon production from producing wells. Additionally, the Debtor assigned certain Overriding Royalty Interests in its Leases, and thus owe the Overriding Interest Owners their share of the proceeds related to the sale of hydrocarbons.

25.    Prior to the Petition Date, the Debtor sold certain working interests in wells it operated. In conjunction with those working interests, the Debtor entered into a number of joint operating agreements (the "**JOAs**"). Pursuant to the JOAs, the Debtor nets out the Working Interests Owners' share of the expenditures against the Working Interest Owner's share of the revenue. The Debtor then pays the Working Interests Owners the net amount of the Working Interest Owner's share of the revenue (the "**Working Interests Owner Payments**" and, together with the Royalties, the "**Royalty Payments**"). Prior to the Petition Date, the Debtor was current on all Royalty Payments to the Interest Owners.[6] The Debtor requests authority to allow the Debtor (and the Gatherers on behalf of the Debtor) to continue to pay all prepetition Royalty Payments due and owing to the Interest Owners and to continue to make Royalty Payments (and continue to allow the Gatherers to deduct and pay on behalf of the Debtor) in the ordinary course of business during the course of this chapter 11 case.

26.    In the ordinary course of business, the Debtor also incurs severance taxes (the "**Severance Taxes**") that must be remitted to Oklahoma Tax Commission for oil and gas production each month. Like the Royalties and payments to the Overriding Royalty Interest Holders, the Gatherers pay the Severance Taxes and then deduct the corresponding amount from the amount they owe the Debtor on account of the purchased oil. The Debtor seeks authority to allow the Gatherers to continue to deduct such Severance Taxes on an ongoing basis and in the

---

[6] The Debtor notes that as of the Petition Date, there was approximately $7,300 in checks that had been written for Working Interest Owner Payments that had not yet cleared.

ordinary course.

27.     In addition to the Severance Taxes, the Debtor also incurs certain expenses related to the transportation, gathering, processing and service charges (the "**Gathering Fees**") in connection with the sale of its oil and gas production each month. Similar to the other expenses and payments deducted, the Gathering Fees are automatically deducted out of the gross amounts owed to the Debtor from the Gatherers. The Debtor seeks authority to allow the Gatherers to deduct prepetition and post-petition Gathering Fees from the amounts paid to the Debtor in the ordinary course.

28.     It is my belief that the payment of the Obligations (including the Interest Owner Payments, Severance Taxes and Gathering Fees) is in the best interests of the Debtor's estate, its creditors and all other parties in interest. Furthermore, the payment of the Obligations is necessary to maintain the Debtor's rights under the Leases and to ensure that its operations continue on an uninterrupted basis, as the related revenues represent substantially all of the Debtor's operating income. If the Debtor is unable to pay the Obligations as they come due, the Debtor's operations could be severely impacted—including the Debtor incurring penalties and interest, turnover actions, conversion, and constructive trust claims, and litigation.

29.     Further, it is my understanding, that under both Texas and Oklahoma law, the Interest Owners may be entitled to assert statutory liens on the Debtor's property. The attachment of statutory liens would serve as a sever disruption to the Debtor at a time when they must focus on restructuring their business. Accordingly, on behalf of the Debtor, I respectfully request that the Court approve the Royalty Motion.

**C.     Insurance Motion.**

30.     The Debtor's *Emergency Motion for Interim and Final Order Authorizing the*

*Debtor to Maintain Insurance Policies* seeks an interim and final order from the Court (a) authorizing the Debtor to maintain its insurance policies (collectively, and as described herein, the "**Insurance Policies**"), including the renewal and/or modification thereof in the ordinary course, including making monthly installment payments that will become due and owing during the first 21 days of this case; (b) authorizing and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of the related Insurance Policies; (c) scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order, to the extent necessary.

31. The Debtor maintains four insurance policies that can be generally summarized and described as follows:

| Policy Type | Insurance Carrier or Broker | Expiration | Ann/ Renewal Premium | Installment Pmt |
|---|---|---|---|---|
| Workers Comp | Texas Mutual | 5/10/19 | $3,743.00 | $0.00 |
| Property/ Liability | Bitco Insurance | 6/27/18 | $5,982.00 | $2,986.20 |
| Commercial Umbrella | Boley Featherston | 6/27/18 | $6,028.94 | $0.00 |
| Health Insurance | Blue Cross Blue Shield | 12/1/18 | $0.00 | $8,132.06 |

32. The Debtor recently renewed the Workers Comp policy and thus no premiums are due until next May. The Property/Liability and Commercial Umbrella policies expire on June 27, 2018 with the renewal amount owed June 27, 2018 as well. Finally, the Debtor's health insurance it provides for its employees is paid on a monthly basis, with the monthly payment due on the first of the month. The Debtor is not aware of any prepetition amounts owed, but seeks approval to continue its insurance programs in the event any of the policies would be deemed prepetition obligations, and to provide assurances to the insurance carriers related to the Debtor's payment of the premiums. As explained more fully in the Insurance Motion, failure to maintain insurance can be a basis for "cause" to exists to convert or dismiss the case, and the United States Trustee

guidelines require the maintenance of insurance. Accordingly, the Debtor respectfully requests that the Court grant the relief requested in the Insurance Motion.

Executed on June 25, 2018.

By: */s/ Derek Jensen*
Derek Jensen
President
Fulcrum Exploration, LLC