# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CASE NO. 18-32070-sgj-11** |
| **FULCRUM EXPLORATION, LLC** | § | |
| | § | **Chapter 11** |
| Debtor | § | |

---

## DEBTOR'S DISCLOSURE STATEMENT IN SUPPORT
## OF DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

Jason P. Kathman
State Bar No. 24070036
Brandon J. Tittle
State Bar No. 24090436
PRONSKE & KATHMAN, P.C.
2701 Dallas Pkwy, Suite 590
Plano, Texas 75093
(214) 658-6500 – Telephone
(214) 658-6509 – Facsimile

**COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION**

**DATED: FEBRUARY 18, 2019**

## TABLE OF CONTENTS

I.      **INTRODUCTORY STATEMENT AND DISCLOSURES** ..........................................................3

    1.1    Introduction.............................................................................................................. 3

    1.2    Considerations in Preparation of the Disclosure Statement and Plan; Disclaimers .......... 3

    1.3    Disclosure Statement; Construction ......................................................................... 5

    1.4    The Confirmation Hearing and Objection Deadline.................................................. 6

    1.5    Recommendation of the Debtor to Approve the Plan................................................ 6

II.     **DEBTOR'S BACKGROUND INFORMATION** .......................................................7

    2.1    History of the Debtor ............................................................................................... 7

    2.2    Events Leading to Chapter 11................................................................................. 7

III.    **EVENTS DURING THE CHAPTER 11 CASES** ....................................................8

    3.1    Commencement of the Chapter 11 Case .................................................................. 8

    3.2    Cash Collateral and Post-Petition Financing ............................................................ 8

    3.3    Royalty and Working Interest Motion ...................................................................... 9

    3.4    Retention of Professionals by the Debtor ................................................................. 9

    3.5    Bankruptcy Schedules and Statement of Financial Affairs ...................................... 10

    3.6    Meeting of Creditors............................................................................................. 10

    3.7    Operating Reports ................................................................................................. 10

    3.8    Motion to Assume ................................................................................................. 10

    3.9    Litigation.............................................................................................................. 10

IV.    **FINANCIAL INFORMATION** ..........................................................................13

    4.1    Assets.................................................................................................................. 13

    4.2    Liabilities ............................................................................................................. 14

    4.3    Other ................................................................................................................... 15

V.     **PLAN OVERVIEW** ...........................................................................................15

    5.1    Introduction.......................................................................................................... 15

    5.2    Summary of the Plan and Proposed Distributions Under the Plan .................................. 16

VI.    **SUMMARY OF CERTAIN PLAN PROVISIONS** ..............................................19

    6.1    Means for Implementation of the Plan .................................................................... 19

    6.2    Treatment of Executory Contracts and Unexpired Leases ............................................ 23

    6.3    Effects of Confirmation ........................................................................................ 25

    6.4    Retention of Jurisdiction ....................................................................................... 26

    6.5    Procedures for Resolving Disputed, Contingent and Unliquidated Claims .................... 26

| | | | |
|---|---|---|---|
| **VII.** | **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND SECURITIES LAW CONSIDERATIONS** | ........................................................................ | **27** |
| | 7.1 | Tax ......................................................................................................... | 27 |
| | 7.2 | Securities .............................................................................................. | 28 |
| **VIII.** | **FINANCIAL INFORMATION AND PROJECTIONS** | ........................................................ | **28** |
| | 8.1 | Financial Information ........................................................................... | 28 |
| | 8.2 | General Assumptions ............................................................................ | 29 |
| | 8.3 | Assumptions with Respect to Financial Projections ............................. | 30 |
| | 8.4 | Summary of Financial Projections ........................................................ | 30 |
| **IX.** | **THE BEST INTERESTS OF CREDITORS TEST** | ..................................................... | **31** |
| | 9.1 | Best Interests of Creditors Test............................................................ | 31 |
| | 9.2 | Liquidation Analysis ............................................................................ | 32 |
| **X.** | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | ....... | **32** |
| | 10.1 | Alternative Plan(s) ............................................................................... | 33 |
| | 10.2 | Alternative Sale .................................................................................... | 33 |
| | 10.3 | Liquidation Under Chapter 7 ................................................................ | 33 |
| | 10.4 | Dismissal ............................................................................................... | 33 |
| | 10.5 | Other Alternatives ................................................................................ | 34 |
| **XI.** | **CERTAIN RISK FACTORS TO BE CONSIDERED** | ............................................. | **34** |
| | 11.1 | Cash Collateral Milestones .................................................................. | 34 |
| | 11.2 | Certain Bankruptcy Law Considerations .............................................. | 35 |
| | 11.3 | Estimated Recovery Risks .................................................................... | 36 |
| **XII.** | **VOTING PROCEDURES AND REQUIREMENTS** | .............................................. | **36** |
| | 12.1 | Voting Deadline .................................................................................... | 36 |
| | 12.2 | Creditors Solicited to Vote .................................................................. | 37 |
| | 12.3 | Definition of Impairment ...................................................................... | 37 |
| | 12.4 | Classes Impaired Under the Plan .......................................................... | 38 |
| | 12.5 | Votes Required for Class Acceptance ................................................... | 38 |
| | 12.6 | Specific Considerations in Voting ........................................................ | 38 |
| **XIII.** | **MISCELLANEOUS PROVISIONS** | ..................................................................... | **38** |
| | 13.1 | Disclosures Required by the Bankruptcy Code ..................................... | 38 |
| | 13.2 | Certain Rights Unaffected .................................................................... | 39 |
| | 13.3 | Binding Effect ....................................................................................... | 39 |
| | 13.4 | Notices .................................................................................................. | 39 |

13.5 Injunctive Relief ........................................................................................................... 40

**XIV. RECOMMENDATION AND CONCLUSION** ...........................................................................**40**

# DISCLAIMER

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE DEBTOR'S PLAN OF REORGANIZATION DATED FEBRUARY 18, 2019 (AS AMENDED, MODIFIED AND SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"), IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, ANY SUPPLEMENTS TO THE PLAN, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTOR EXPRESSLY DISCLAIMS ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT AND THE PLAN FOR THE DEBTOR DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSIONS, ANY OTHER NATIONAL SECURITIES COMMISSION OR REGULATORY BODY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION NOR ANY NATIONAL SECURITIES COMMISSION OR REGULATORY BODY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. TO THE EXTENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, NEITHER THE OFFER NOR THE ISSUANCE OF ANY SUCH SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE 1933 ACT OR ANY SIMILAR STATE SECURITIES LAWS. ANY SUCH OFFER OR ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION THEREUNDER SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE

DEBTOR IN THIS CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO DO NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTOR AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR THE PURPOSE OF SOLICITING ACCEPTANCE OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR.

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes information regarding certain "forward-looking statements" within the meaning of section 27A of the 1933 Act and section 21E of the Securities Exchange Act of 1934, as amended, all of which are based upon various estimates and assumptions that the Debtor believes to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, but are not limited to:

- litigation risks and uncertainties;

- costs associated with the Debtor's restructuring efforts, including its chapter 11 filing; and

- claims and liability estimates

You should understand that the foregoing as well as other risk factors discussed in this Disclosure Statement, including those listed in Article XI of this Disclosure Statement under the heading "Certain Factors to be Considered," could cause future outcomes to differ materially from those expressed in such forward-looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Debtor undertakes no obligation to publicly update or revise information concerning the Debtor's restructuring efforts or their cash position or

any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement, except as required by law.

## ARTICLE I
## INTRODUCTORY STATEMENT AND DISCLOSURES

### 1.1    Introduction

On June 24, 2018, the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), thereby initiating this bankruptcy case (the "Bankruptcy Case").

Pursuant to the terms of the Bankruptcy Code, this Disclosure Statement has been approved by the Bankruptcy Court.  Such approval is required by statute and will not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

Contained in the packet of documents which has been sent to you by the Debtor is the Disclosure Statement, the Plan, the Ballot for Voting on the Plan (the "Ballot") and the Order Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejection of Plan, Combined with Notice Thereof.  Please read all of these materials carefully.  Please note that in order for your vote to be counted, you must: 1) include your name and address, 2) fill in, date, and sign the enclosed Ballot and 3) return it to the attorney for the Debtor by the date and time specified on the Ballot. If you did not receive a Ballot and believe that you should have, please contact counsel for the Debtor via either facsimile at (214) 291-2665 or via email at lvargas@pgkpc.com.

### 1.2    Considerations in Preparation of the Disclosure Statement and Plan; Disclaimers

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS ARE URGED TO CAREFULLY CONSIDER THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTOR PRESENTLY INTENDS TO SEEK TO CONSUMATE THE PLAN AND

TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE. HOLDERS OF CLAIMS AND EQUITY INTERST ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

*****

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OR CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR CERTAIN DOCUMENTS (AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND SPECIFIED DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO); STATUTORY PROVISIONS, EVENTS, OR INFORMATION. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO REVIEW THE ENTIRE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A. IN THE EVENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS FOUND TO BE INCONSISTENT WITH A PROVISION OF THE PLAN, THE PROVISION OF THE PLAN SHALL CONTROL**

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

*****

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN

ARE DEEMED SECURITIES, THE DISTRIBUTION OF ANY SECURITIES PURSAUNT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, OR SUCH OTHER DATE AS DESCRIBED HEREIN. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS DETERMINED BY THE DEBTOR OR ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT, AND AN ESTIMATE SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE AMOUNT OF SUCH CLAIM.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

### 1.3    Disclosure Statement; Construction

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Debtor to holders of Claims and Equity Interests for use in this solicitation or acceptances from the holders of Claims (the "Solicitation") of the Plan, a copy of which is attached hereto as **Exhibit A.  Unless otherwise defined in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Plan.**

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, (iii) article, section and exhibit references are to this Disclosure Statement unless otherwise specified, and (iv) with respect to any Distribution or Payment under the Plan, "on" a date means on or as soon as reasonably practicable thereafter.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. By order of the Bankruptcy Court, this Disclosure Statement was approved and held to contain adequate information.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE**

STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE EFFECTUATED.

### 1.4    The Confirmation Hearing and Objection Deadline

THE BANKRUPTCY COURT HAS SET _____, 2019, AT _____.M., CENTRAL TIME, AS THE DATE AND TIME FOR THE COMMENCMENT OF THE HEARING ON CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN. THE CONFIRMATION HEARING WILL BE HELD AT THE UNITED STATES BANKRUPTCY COURT, JUDGE JERNIGAN'S COURTROOM, 1100 COMMERCE STREET, 14TH FLOOR, DALLAS, TEXAS 75242. THE DEBTOR WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.

THE BANKRUPTCY COURT HAS FURTHER FIXED _____, 2019, AT 4:00 P.M., CENTRAL TIME, AS THE DEADLINE (THE "OBJECTION DEADLINE") FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED SO AS TO BE RECEIVED BY THE COUNSEL TO THE DEBTOR ON OR BEFORE THE OBJECTION DEADLINE.

ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS EQUITY INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### 1.5    Recommendation of the Debtor to Approve the Plan

The Debtor approved the solicitation of the acceptance of the Plan and of the transactions contemplated thereunder. In light of the benefits to be attained by the holders of Claims under the Plan, the Debtor recommends that such Holders of Claims vote to accept the Plan. The Debtor has reached this decision after considering the alternatives to the Plan that are available to the Debtor. These alternatives include liquidation under chapter 7 of the Bankruptcy Code or dismissal of the Debtor's bankruptcy case. The Debtor determined, after consulting with legal advisors, the Plan likely results in a distribution of greater value than would a liquidation under chapter 7.

## ARTICLE II
## DEBTOR'S BACKGROUND INFORMATION

### 2.1    History and Corporate Structure of the Debtor

The Debtor is a privately-owned oil and gas exploration, development and production company headquartered in Flower Mound, Texas. The Debtor owns operating working interests in approximately 75 wells in southwest Oklahoma, primarily in Jackson and Tillman counties, as well as certain personal property (together, the "**Debtor's Assets**").

The Debtor is a Texas limited liability company, formed in August of 2006 to own and operate oil and gas wells in southwest Oklahoma, and is the successor in interest, via merger, of CanAm Oil & Gas, LP ("**CanAm**"). On or about September 20, 2016, Debtor and CanAm filed with the Texas Secretary of State their Certificate of Merger outlining the applicable disclosures and information related to the merger of the two entities (the "**Merger**"). Prior to the Merger, the Debtor was owned by fourteen (14) individuals or entities, none of which owned more than 25% of the equity interest.  CanAm was a Texas limited partnership whose general partner was the Debtor and whose sole limited partner was Louis Ouellette ("**Ouellette**"). After the Merger, the Debtor is now owned 45% by Ouellette, and 55% by the members who previously owned 100% of the interests in the Debtor prior to the Merger.

Prior to the Merger, CanAm owned approximately 45 wells that were operated by the Debtor. The Debtor owned approximately 25 wells that it operated. After the Merger, the Debtor's operating agreement provides that the members' share of profit and loss is calculated based upon the profit and loss of the "Pre-Merger CanAm Wells" and "Pre-Merger Fulcrum Wells" (*i.e.,* the wells that were owned by the respective entities prior to the Petition date).

The Debtor's oil and gas properties encompass approximately 4,000 acres in Jackson and Tillman counties, Oklahoma. The Debtor is the operator on all of the wells it owns working interests in. Shortly after the Petition Date, the Debtor obtained updated reserve reports related to their oil and gas assets that valued the reserves in excess of $30 Million (USD).

### 2.2    Events Leading to Chapter 11

Like many other E&P companies, the dramatic decline in oil and gas prices had a significant impact on the Debtor and its operations. More specifically, the decline in oil and gas prices made drilling new wells uneconomic. Further, the decline in oil and gas prices led to a decline in the value of the Debtor's oil and gas reserves, which in turn led to a decrease in its borrowing base and availability on their reserve-based line of credit with their lender. Without availability to capital, the Debtor was forced to put some of its new drilling operations on hold, which further complicated and impacted the valuation of the Debtor's reserves.

In an attempt to offset the economic effects on the reserve report (*i.e.*, no new production because no new wells), the Debtor drilled a number of new wells in 2016. One of those wells was the CanAm 2-1. The CanAm 2-1 was drilled between two of the Debtor's other wells that were

consistent producers and positioned to take advantage of the Debtor's saltwater injection system. The CanAm 2-1 was completed in October 2016 and initially produced 80-90 Bbls of oil per day. However, in March of 2017, production on the CanAm 2-1 began to drop-off and the Debtor began to notice complications with the surrounding wells also. Over the next six to eight months, the Debtor worked to analyze these complications, eventually stabilizing the CanAm 2-1 and surrounding wells in October 2017.

In early January 2018, the Debtor met with its prepetition secured lender, Veritex Community Bank ("**Veritex**"), to discuss the complications related to the CanAm 2-1 and the effects on the Debtor's reserve report and borrowing base. At the meeting, Veritex asserted certain defaults in the prepetition loan agreement, and required the Debtor to modify the September 1, 2018 maturity date of the loan, to May 1, 2018 (the "**Fifth Amendment to Loan Agreement**"). The Fifth Amendment to Loan Agreement also added an additional requirement that the Debtor was required remit 100% of its "Excess Cash Flow" for payment towards the balance on the loan with Veritex.

On May 2, 2018, Veritex made demand for payment of the loan (the "**May 2 Demand Letter**"). Partially in response to the May 2 Demand Letter, the Debtor and Veritex met and negotiated a forbearance (the "**Prepetition Forbearance Agreement**"). The Prepetition Forbearance Agreement required, among other things, that the Debtor pay $300,000 as a principal pay down by June 23, 2018, and another approximately $85,000 in accrued interest by June 25, 2018. Instead of making the $385,000 of payments, the Debtor chose to preserve its capital and filed this case.

## ARTICLE III
## EVENTS DURING THE CHAPTER 11 CASE

### 3.1     Commencement of the Chapter 11 Case

On the Petition Date, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has operated its business as a debtor in possession.

### 3.2     Cash Collateral and Post-Petition Financing

On June 25, 2018, the Debtor filed its Emergency Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and (II) Granting Adequate Protection to the Prepetition Secured Lender (the "Cash Collateral Motion")[Docket No. 2]. The Court entered three separate interim orders authorizing the use of cash collateral [Docket Nos. 22, 42, and 69], and ultimately entered its Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 (I) Authorizing Debtor's Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Modifying the Automatic Stay, and (IV) (Scheduling Final Hearing (the "Original Final CC Order")[Docket No. 72].

On February 8, 2019 the Debtor filed its Motion to Modify Cash Collateral Order [Docket No. 96], which seeks *inter alia* to (i) extend the consensual use of cash collateral, and (ii) memorialize certain milestones related to confirmation of the Plan and consummation of the proposed transaction with MHI.

On February 8, 2019, the Debtor filed its Motion to Approve Post-Petition Financing Pursuant to 364(b) [Docket No. 97], which seeks to approve a small bridge loan in the amount of $70,000 from one of the Debtor's owners, Louis Ouellette. A hearing on the Motion to Modify is currently set for February 28, 2019.

### 3.3     Royalty and Working Interest Motion

On June 25, 2018, along with its other first day motions, the Debtor filed its Emergency Motion for Interim and Final Orders Authorizing Debtor-in-Possession to Pay or Honor Prepetition and Post-Petition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Gas Leases (the "Royalty Motion")[Docket No. 3]. The Royalty Motion sought authority to pay the following prepetition and post-petition obligatons of the Debtor related to its oil and gas operations: (i) certain interest owner payments, (ii) severance taxes and (iii) gathering fees.

At the conclusion of the first day hearings, the Court entered an Interim Order Authorizing Debtor-in-Possession to Pay or Honor Prepetition and Post-Petition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Gas Leases [Docket No. 23] authorizing limited relief. The Court subsequently entered its Second Interim Order Authorizing Debtor-in-Possession to Pay or Honor Prepetition and Post-Petition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Gas Leases (the "Second Interim Royalty Order")[Docket No. 59], which authorized the Debtor to pay royalties, obligations related to severance taxes and gathering fees, certain amounts related to overriding royalty interests. Additionally, the Second Interim Royalty Order required that the Debtor escrow payments owed to certain unrecorded working interest owners. A third interim order [Docket No. 67] was entered that allowed payment to the overriding royalty interest owners without any potential to have the payments later attacked. Finally, the Debtor was able to reach an agreement with Veritex regarding the payment of working interests to one particular working interest owner, Doug Fike, and the escrow of any payments that may have been owed to any other unrecorded working interest owners. The agreement was memorialized in the Court's Final Order Authorizing Debtor-in-Possession to Pay or Honor Prepetition and Post-Petition Royalty Obligations, Working Interest Obligations and Other Obligations Related to Oil and Gas Leases [Docket No. 71].

### 3.4     Retention of Professionals by the Debtor

On July 9, 2018, the Debtor filed its Motion for Order Authorizing Debtor to Employ Professionals Used in the Ordinary Course of Business as of the Petition Date (the "**OCP Motion**")[Docket No. 29]. The OCP Motion specifically sought to employ two petroleum engineering firms (JB Garret Engineering and William M Cobb & Associates), accountants the Debtor has used for years (Cole and Company), and a geologist (EMJ Consulting). On July 20, 2018, the Court entered an order [Docket No. 43] approving the relief requested in the OCP

Motion.

On July 13, 2018, the Debtor sought to employ the law firm of Pronske Goolsby & Kathman, P.C.[1] as counsel for the Debtor [Docket No. 35]. On August 14, 2018, the Bankruptcy Court entered an order [Docket No. 56] approving the employment of Pronske Goolsby & Kathman, P.C. as counsel for the Debtor.

On December 5, 2018, the Debtor sought to employ the law firm of McGuire Craddock & Strother, P.C. as special corporate counsel for the Debtor [Docket No. 88]. Specifically, McGuire Craddock & Strother, P.C. was hired to handle the corporate aspects of the MHI Transaction. On January 10, 2019, the Court entered an order [Docket No. 92] approving the employment of McGuire Craddock & Strother, P.C.

### 3.5    Bankruptcy Schedules and Statement of Financial Affairs

On July 24, 2018, the Debtor filed its Bankruptcy Schedules. The Bankruptcy Schedules set forth the detailed list of the Debtor's assets and liabilities as of the commencement of this case. The Debtor has subsequently filed amendments to its schedules.

### 3.6    Meeting of Creditors

On August 2, 2018, the United States Trustee conducted the meeting of creditors pursuant to section 341 of the Bankruptcy Code for the Bankruptcy Case.

### 3.7    Operating Reports

As required by the United States Trustee, Monthly Operating Reports during the pendency of this case have been filed with the Clerk of the Bankruptcy Court. The Monthly Operating Reports are incorporated herein by reference. A copy of the Debtor's most recent monthly operating report is attached hereto as **Exhibit B.**

### 3.8    Motion to Assume

On October 15, 2018, the Debtor filed its Motion to Assume Flower Mound Lease (the "Flower Mound Assumption Motion")[Docket No. 76]. The Flower Mound Assumption Motion sought to assume the office lease where the Debtor operated. The Court entered an order [Docket No. 80] approving the assumption of the lease on October 18, 2018.

### 3.9    Litigation

(a)    Potential Litigation

The Plan preserves all Causes of Action. The Causes of Action include certain Avoidance Actions and other claims and potential claims that the Debtor holds against third parties. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Plan further

---

[1] As of January 1, 2019, Pronske Goolsby & Kathman, P.C. operates under the name of Pronske & Kathman, P.C.

provides that the Reorganized Debtor will have standing, on and after the Effective Date of the Plan, to pursue Causes of Action retained under the Plan. The Estate may hold the following Causes of Action, among others, all of which shall be preserved (unless expressly otherwise released by the Plan):

(i)     Strong Arm Avoidance Actions.

Under section 544 of the Bankruptcy Code, a debtor has the ability to avoid any interest that are unrecorded as of the Petition Date. Prior to the Petition Date, the Debtor sold working interests in a number of wells and the assignment of those working interests were never recorded by the working interest owners. As such, the Debtor likely has viable claims to avoid any working interests those working interest owners may have in those wells. The Plan expressly proposes to approve settlements reached with the holders of these working interests. However, to the extent that those working interest owners do not accept the applicable proposed settlements, the Debtor reserves all rights to sue those working interest owners, including the Unrecorded WI Owners, Unrecorded Box-In WI Owners, Wayne Starin, and Fulcrum Production Partners LP.

Likewise, at least one creditor, Haliburton Energy Services, Inc., has filed a proof of claim alleging that its claim is secured. The Debtor is unaware of any mechanics liens filed by Haliburton Energy Services, Inc. The Debtor hereby preserves and reserves any and all rights to object to Haliburton Energy Services, Inc.'s claim, including, to the extent necessary, filing an adversary proceeding to avoid any alleged lien Haliburton Energy Services, Inc. may assert.

(ii)    Fraudulent Transfers and Other Avoidance Actions.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the debtor receives less than fair value for such property. In addition, avoidance actions exist under section 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property. The Debtor has not yet estimated the potential recovery from the prosecution of their Avoidance Actions. The Plan proposes to pay General Unsecured Creditors in full. As such, the Debtor may choose to forego pursuing fraudulent transfer and preference causes of action.

(iii)   Other Causes of Action.

The Reorganized Debtor will continue the investigation and analysis of Causes of Action. There may be numerous Causes of Action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtor and as a result, cannot be raised during the pendency of the Bankruptcy Case (collectively the "Unknown Causes of Action"). The

failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtor to pursue any Unknown Cause of Action to the extent that facts underlying such Unknown Cause of Action become fully known to the Debtor or Reorganized Debtor.

The Debtor has attempted to disclose herein certain material Causes of Action including Avoidance Actions and other actions that it may hold against third parties. However, the Debtor has not performed an exhaustive investigation or analysis of all potential claims and Causes of Action against third parties. It is the contemplation of the Plan, that such investigation and analysis will continue post-confirmation by the Reorganized Debtor. You should not rely on the omission of the disclosure of a claim or Cause of Action to assume that the Debtor holds no claim or Cause of Action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims and Causes of Action against third parties are specifically reserved, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach of fiduciary duty, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

Unless expressly released by the Plan or by an order of the Bankruptcy Court, the Debtor may hold claims against a holder of a Claim or Equity Interest, including but not limited, the following claims and Causes of Action, all of which shall be preserved:

- Fraudulent transfer and other avoidance claims arising under sections 506, 542,

543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and various state laws;

- Avoidance Actions related to any unrecorded working interest owners, including, but not limited to any of the Unrecorded Walls WI Owners, the Unrecorded Box-In WI Owners, Wayne Starin, and Fulcrum Production Partners LP.
- Unauthorized post-petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;Claims and Causes of Action asserted in current litigation, whether commenced pre- or post-petition; and
- Counterclaims asserted in current litigation.

The Debtor's failure to identify a claim or Cause of Action herein is specifically not a waiver of any claim or Cause of Action. The Debtor will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any Cause of Action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or Causes of Action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtor's failure to identify a claim or Cause of Action herein shall not give to any defense of any preclusion doctrine, including but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches, with respect to claims or Causes of Action which could be asserted against third parties, including holders of Claims against Equity Interests in the Debtor who may be reading this Disclosure Statement and/or casting a Ballot, except where such claims or Causes of Action have been released in the Plan or the Confirmation Order.

In addition, the Debtor expressly reserves the right to pursue or adopt any claim alleged in any lawsuit in which the Debtor is a party.

**PLEASE TAKE NOTICE THAT, WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTOR AND ITS ESTATE, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND PURSUANT TO THE TERMS OF THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, AS THE DEBTOR INTENDS FOR THE PLAN TO PRESERVE ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTOR AND ITS ESTATE AS OF THE EFFECTIVE DATE OF THE PLAN.**

**ARTICLE IV**
**FINANCIAL INFORMATION**

**4.1** **Assets**

The Debtor's assets as of the Petition Date are set forth in the Bankruptcy Schedules and reference should be made thereto for information concerning such assets as of the Petition Date. The Debtor's Schedules and the amendments thereto can be found filed as Docket No. 44. The pleadings and documents filed in the Bankruptcy Case are publicly available for viewing between the hours of 8:30 a.m. to 4:30 p.m. at the Bankruptcy Clerk's Office, 1100 Commerce Street, Room 1254, Dallas, Texas 75242 or electronically at pacer.txnb.uscourts.gov for a fee. More specifically, the Debtor had, among other assets: Cash as of the Petition Date in the amount of approximately $125,000, Accounts Receivable as of the Petition Date of $161,712, inventory in the form of various pipe, fittings, pumps and materials, as of the Petition Date in amount equal to approximately $25,000, and oil and gas reserves worth approximately $30 Million.

**4.2** **Liabilities**

(a)    Prepetition

(i)    Priority Claims

Except for administrative expense claims, the Debtor has a very small amount of claims (approx. $862.40) entitled to priority under the Bankruptcy Code. These non-administrative expense priority claims consist of a small amount of money owed to the IRS for 941 taxes, the Oklahoma Tax Commission, and the Texas Workforce Commission.

(ii)    Ad Valorem Tax Claims

Two Taxing Authorities, Lewisville ISD and Denton County, have each filed proofs of claim that equal $83.91 in the aggregate. These claims are related to personal property taxes related to personal property held at the Debtor's headquarters in Flower Mound, Texas.

(iii)    Secured Claims Held by Veritex Community Bank

The Debtor's Bankruptcy Schedules disclose a Secured Claim held by Veritex Community Bank in the amount of $8,264,981.38. The amount arises from the Debtor's prepetition reserve-based line of credit.

(iv)    Filed Claims

As of the filing of this Disclosure Statement, approximately twenty claims were filed. The Debtor is only in the initial stage of the Claims reconciliation process and it expects that a significant portion of the process will be conducted by the Reorganized Debtor, after the Effective Date of the Plan.

(b)    Post-Petition

The Debtor has incurred, and will continue to incur, certain Administrative Claims. Specifically, the Debtor has incurred Administrative Claims for reasonable professional fees owed to its counsel and the counsel for Veritex Community Bank. In addition to these amounts, there is likely certain administrative expenses due that are incurred in the ordinary course of the Debtor's operations.

### 4.3    Other

For a more detailed discussion and analysis of the Debtor's assets and liabilities, reference should be made to the exhibits attached hereto, the Debtor's Bankruptcy Schedules, the Proofs of Claim filed and the Debtor's Monthly Operating Report.

PLEASE NOTE THAT ANY REVIEW OF THE SCHEDULES MAY NOT PRESENT THE COMPLETE FINANCIAL PICTURE OF THE DEBTOR. THE SCHEDULES MUST BE REVIEWED ALONG WITH, *INTER ALIA*, THE CLAIMS REGISTER AND ANY ORDERS OF THE BANKRUPTCY COURT RELATING SPECIFICALLY TO CLAIMS IN THIS BANKRUPTCY CASE.

## ARTICLE V
## PLAN OVERVIEW

### 5.1    Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtor and its assets. In furtherance of these two goals, upon the filing of a petition for relief under Chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Bankruptcy Case.

The consummation of a plan is typically the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and equity interests in, a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, and any creditors of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

**THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY**

**REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.**

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR, ITS ESTATE, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### 5.2    <u>Summary of the Plan and Proposed Distributions Under the Plan.</u>

The primary purpose of the Plan is to facilitate the resolution and treatment of the Debtor's outstanding Claims, Liens and Equity Interests. The Plan contemplates the sale of substantially all of the Debtor's assets to Mineral Hill Industries, or a wholly-owned subsidiary of MHI, MHI NewCo.

Under the Plan, Claims against, and Equity Interests in, the Debtor are placed into Classes. Certain Claims, including Priority Claims and Administrative Claims, are not classified and, if not paid prior to Confirmation, will receive payment in full in Cash on the distribution date set forth in the Plan as described below.

The table below summarizes the classification and treatment of the prepetition Claims and Equity Interest under the Plan.  This summary is qualified in its entirety by reference to provision of the Plan.

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Claims or Equity Interests[2] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 1: Ad Valorem Taxing Authorities | Impaired | $83.91 | Unless otherwise agreed, each holder of an Allowed Ad Valorem Tax Claim, excluding any penalties, shall receive in full discharge or and in exchange for such Allowed Ad Valorem Tax Claim, and the Lien(s) securing the same, Cash in the full amount of their Allowed Claim, at the option of the Reorganized Debtor, |

---

[2] Claims are estimates only and may be subject to all objections.  The Debtor reserves all rights regarding the same. Claims included in one class may be properly classified in another class.

| | | | by the later of (a) fifteen (15) days after the Effective Date, and (b) fifteen (15) days after becoming an Allowed Ad Valorem Tax Claim. Each holder of an Allowed Ad Valorem Tax Claim shall retain all liens in, to, or against any property of the Debtor and the Estate, such Liens shall continue to apply and attach to the Collateral with the same validity, extent, and priority as otherwise exists pending payment of each Allowed Ad Valorem Tax Claim in full, together with all applicable interest. Upon the payment of each Allowed Ad Valorem Tax Claim in full, together with all applicable interest, each lien securing such Allowed Ad Valorem Tax Claim shall be automatically, and without need for further order, document, or action, released and discharged. Estimated Recovery – 100% |
|---|---|---|---|
| Class 2: Secured Claims of Veritex Community Bank | Impaired | $8,264,981.38 | In full and final satisfaction, discharge, and release of the Veritex Claim, Veritex shall receive (i) cash in the amount of five million dollars ($5,000,000 USD) from the Cash Proceeds, and (ii) the New Veritex Note. Estimated Recovery – 100% |
| Class 3.1: Claims of Unrecorded Walls WI Owners | Impaired | Approx. $440,000 | In full and final satisfaction of the Allowed Class 3.1 Claims, each Holder of a Class 3.1 Claim shall receive its Pro Rata share of: (i) the Walls 7 Carveout, (ii) the Walls 8 Carveout, (iii) the Walls 9 Carveout, and (iv) the Walls 10 Carveout. Estimated Recovery – 100% |
| Class 3.2: Claims of Walls NPI Owners | Impaired | Approx. $105,000 | In full and final satisfaction of the Allowed Class 3.2 Claims, each Holder of a Class 3.2 Claim shall be entitled to enter into new Net Profits Interests with MHI NewCo on the same terms as the prepetition Net Profits Agreements. Estimated Recovery – 100% |
| Class 3.3: | Impaired | Unknown[3] | Holders of Allowed Class 3.3 Claims shall not receive |

[3] The Debtor has certain setoff rights pursuant to Section 553 against each of the Unrecorded Box-In Owners such that the amounts owed by the Unrecorded Box-In WI Owners is greater than any amounts that would result from an avoidance of their unrecorded working interests.

| | | | |
|---|---|---|---|
| Claims of Unrecorded Box-In WI Owners | | | any Distributions or consideration on account of their Allowed Class 3.3 Claims.<br><br>Estimated Recovery – 0% |
| Class 4: Administrative Convenience Claims | Impaired | Approx. $3,495.50 | Allowed Class 4 Administrative Convenience Claims shall be paid 100% of their Allowed Claim on or before the date that is sixty (60) days after the Effective Date in full satisfaction of their Allowed Claim (the ("Convenience Payments").<br><br>Estimated Recovery – 100% |
| Class 5: General Unsecured Claims | Impaired | Approx. $336,360.63 | Unless otherwise agreed in writing, Creditors holding Allowed Class 5 General Unsecured Claims shall receive, in full satisfaction and discharge of any Allowed Claim, an amount equal to 100% of their Allowed Claims paid in quarterly payments over a period of five years. The Reorganized Debtor may prepay, Pro Rata, any portion of the Allowed Class 5 Claims at any point without penalty.<br><br>Estimated Recovery – 100% |
| Class 6: Subordinated Claims | Impaired | Approx. $3.5 Million | Unless otherwise agreed in writing, each Class 6 Creditor shall receive, on the MHI Stock Distribution Date, in full satisfaction and discharge of any Allowed Class 6 Claim, an amount of MHI Stock equal in value to their Allowed Class 6 Claim (the "Class 6 Stock Distribution").<br><br>Estimated Recovery – Unknown |
| Class 7: Equity Interest Holders | Impaired | N/A | On account of their Class 7 Equity Interests, the Holders of Equity Interests in the Debtor shall (a) retain their interests in in the Debtor (which Interests will become Interests in the Reorganized Debtor post-confirmation), and (b) on the MHI Stock Distribution Date, their Pro Rata share of the MHI Stock Consideration remaining after the Class 6 Stock Distribution.<br><br>Estimated Recovery – Unknown |

**ARTICLE VI**
**SUMMARY OF CERTAIN PLAN PROVISIONS**

**6.1    Means for Implementation of the Plan**

(a)    <u>Continued Corporate Existence</u>.  Upon completion of the MHI Sale, the Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, with all the powers of a limited liability company under applicable law and without prejudice to any rights to alter or terminate such existence under applicable state law. Further, after the Effective Date and the consummation of the MHI Sale, the Reorganized Debtor shall continue as the licensed operator of the wells sold pursuant to the MHI Sale.

(b)    <u>MHI Sale</u>. Subject to and in connection with the occurrence of the Effective Date, the Debtor shall take all such action as may be necessary or appropriate to effectuate the MHI Sale on the terms and subject to the conditions set forth in the Sale Agreement.

(i)    <u>Sale Agreement</u>.  Upon the occurrence of the Effective Date, the Debtor shall be authorized to execute the Sale Agreement and consummate the transaction(s) contemplated therein.

(ii)    <u>New Veritex Note</u>.  In connection with the MHI Sale, MHI NewCo shall execute the New Veritex Note and the necessary ancillary and collateral documents.

(iii)    <u>Class 5 Note</u>.  In connection with the MHI Sale, MHI NewCo shall execute the Class 5 Note, which shall be equal to the aggregate amount of Allowed Claims in Class 5. The Class 5 Note shall have the following terms:

- <u>Borrower</u>:  MHI NewCo
- <u>Principal</u>.  An amount equal to the aggregate amount of Allowed Claims in Class 5.
- <u>Interest</u>.  The Prime Rate.
- <u>Maturity</u>.  The date that is five (5) years after the Effective Date of the Plan.
- <u>Amortization</u>: The Class 5 Note shall be amortized quarterly over five (5) years, and the Class 5 Note shall be repaid through quarterly amortization payments.

(iv)    <u>Conflicts</u>.  In the event of any conflict whatsoever between the terms of the Plan and the Sale Agreement, the terms of the Plan shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Sale Agreement.

(c)    <u>Compromises and Settlements</u>.  Pursuant to Sections 105 and 363 of the

Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution and other benefits provided in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of certain Claims and Causes of Action arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises or settlements provided in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness. To the extent necessary to effectuate and implement the compromises and releases contained in this Plan, the Plan shall be deemed to constitute a motion under Bankruptcy Rule 9019 seeking the Bankruptcy Court's approval of all of the compromises and releases contained herein. More specifically, and without limiting this provision, the Plan shall be deemed to constitute a motion under Bankruptcy Rule 9019 to settle any Claims and the treatment provided for them in this Plan.

(i)     Settlements with the Unrecored Box-In WI Owners.  The Plan shall be expressly construed as a motion to approve, pursuant to Federal Rule of Bankruptcy Procedure 9019, the settlements with the Unrecorded Box-In WI Owners. As detailed in the Unrecorded Box-In WI Owner Settlement Agreements, attached to the Plan Supplement, the Unrecored Box-In WI Owners who signed settlement agreements agreed to cancel, surrender, and/or transfer any interests they have in any wells of the Debtor in exchange for the Debtor forever releasing them for any and all claims the Debtor may have against such Unrecorded Box-In WI Owners, including any and all claims the Debtor may have for joint interests billings or such Unrecorded Box-In WI Owner's share of operating expenses of authorizations for expenditures.

(ii)     Settlement with Wayne Starin.  The Plan shall be expressly construed as a motion to approve, pursuant to Federal Rule of Bankruptcy Procedure 9010, the Starin Settlement Agreement. As specified further in the Starin Settlement Agreement attached to the Plan Supplement, Wayne Starin agrees to cancel, surrender, and/or transfer any interests he has in any wells of the Debtor in full settlement and release of any and all claims the Debtor has related to 11 U.S.C. § 542 to avoid his unrecorded interests. In exchange, Starin shall receive an Allowed Class 5 Claim in the amount of $70,115.92.

(iii)     Settlement with Fulcrum Production Partners.  The Plan shall be expressly construed as a motion to approve, pursuant to Federal Rule of Bankruptcy Procedure 9010, the Fulcrum Production Partners Settlement Agreement. As specified further in the Fulcrum Production Partners Settlement Agreement attached to the Plan Supplement, Fulcrum Production Partners LP agrees to cancel, surrender, and/or transfer any interests it has in any wells of the Debtor in full settlement and release of any and all claims the Debtor has related to 11 U.S.C. § 542 to avoid its unrecorded interests.

(d) <u>Walls Settlements</u>. The Plan shall constitute a full settlement and compromise of any and all claims, incuding Avoidance Actions, by and between the Unrecorded WI Owners, Walls NPI Owners, the Debtor, and the officers and directors of each of the entities.

(i) <u>The Unrecorded Walls WI Owners Settlement</u>. Each Unrecorded Walls WI Owner shall cancel, surrender, and/or transfer any interests it may have in the Walls Wells. In exchange for such cancellation, surrender, and/or transfer of such interests, the Unrecorded Walls WI Owners shall receive Allowed Class 3.1 Claims equal to the amount each Unrecorded Walls WI Owner paid for its working interests in the Walls Wells.

(ii) <u>Walls NPI Owners Settlement</u>. The Walls NPI Owners shall cancel, relinquish and/or transfer any Net Profits Interests they have in the Walls Wells. In exchange for the cancellation, relinquishment, and/or transfer, each Walls NPI Owner shall receive an Allowed Class 3.2 Claim in an amount equal to what that Walls NPI Owner paid for its net profits interests. Furthermore, the Walls NPI Owners expressly agree that any Claim it may have as a result of the rejection (to the extent applicable) of its net profits interests agreement, shall be characaterized as an Allowed Class 3.2 Claim and shall be expressly limited to the amount that such Walls NPI Owner paid for such net profits interests.

(iii) **<u>Unrecorded Walls WI Owner Releases</u>. As of the Effective Date, the Debtor shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged each Unrecorded Walls WI Owner, its attorneys, accountants, financial advisors, directors, employees, officers, parents, agents, subsidiaries, and the successors and assigns of any of them (collectively, the "<u>Unrecorded Walls WI Owner Releasees</u>") accepting this compromise and settlement on it ballots, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Debtor has, have had, may have or may claim to have against the Unrecorded Walls WI Owner Releasees, including any and all Avoidance Actions.**

(iv) **<u>Walls NPI Owner Releases</u>. As of the Effective Date, the Debtor shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged each of the Walls NPI Owners, its attorneys, accountants, financial advisors, directors, employees, officers, parents, agents, subsidiaries, and the successors and assigns of any of them (collectively, the "<u>Walls NPI Owner Releasees</u>") accepting this compromise and settlement on it ballots, from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums**

of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Debtor has, have had, may have or may claim to have against the Walls NPI Owner Releasees, including any and all Avoidance Actions.

(v)     **Debtor Releases.  As of the Effective Date, each Unrecorded Walls WI Owner or Walls NPI Owner accepting the compromises and settlements on its ballot, shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged each the Debtor, the Debtor's predecessors, successors and assigns, subsidiaries, affiliates, and all of their respective current and former officers and directors, principals, shareholders (regardless of whether such interests are held directly or indirectly), managers, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such (the "Debtor Releasees") from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Unrecorded Walls WI Owner has, have had, may have or may claim to have against the Debtor Releasees.**

(vi)     <u>Acceptance of Settlement By Ballot</u>.  The Unrecorded Walls WI Owners and Walls NPI Owners shall indicate their acceptance of the terms of this settlement by electing as such on the ballots solicited to Class 3.1 and Class 3.2 Creditors.

(e)     <u>Section 1145 Exemption</u>. The offer, issuance, and distribution of all of the MHI Shares hereunder to holders of Allowed Claims and Allowed Fulcrum Equity Interests in the Debtor, as applicable, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under (i) the 1933 Act, as amended, and all rules and regulations promulgated thereunder, (ii) any state, national, or local law requiring registration for the offer, issuance, or distribution of securities, including, any securities law that may govern the issuance of securities in Canada.

(f)     <u>Exemption from Certain Transfer Taxes</u>.  Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer, or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the makting or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments

executed in connection with any of the transaction contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, (d) the grant of collateral to secure the New Veritex Note, and (e) the issuance, renewal, modifications, or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument or transfer under, in furtherance of, or in connection with, the Plan, incluindg, without limitation, the Confirmation Oder, shall not be subject to any document recording tax, stamp tax, conveyance fees, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deed or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamp, stamp tax, transfer tax, intangible tax, or similar tax.

(g)     Post-Effective Date Management.  The Reorganized Debtor shall continue to exist after the Effective Date in accordance with the applicable laws of the State of Texas, for the lawful purposes allowed thereunder, including operating any and all of the well and oil and gas assets sole pursuant to the Sale Agreement. The Reorganized Debtor shall continue to be managed by Derek Jensen and he shall receive compensation commensurate with his experience in the industry.

**6.2     Conditions to Effective Date.**  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied in accordance with the terms hereof:

- The Confirmation Order shall have become a Final Order;
- All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;
- The Debtor, MHI NewCo, and MHI shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan and are required by law, regulation, or order; and
- All conditions precedent to consummation of the MHI Sale, pursuant to the Sale Agreement, shall have been satisfied or waived in accordance with the Sale Agreement.

**6.3     Treatment of Executory Contracts and Unexpired Leases**

(a)     MHI Assigned Contracts and Leases. All MHI Assigned Contracts and MHI Assigned Leases to which the Debtor is a party are hereby assumed and assigned pursuant to, and subject to, the terms of the Sale Agreement.

(b)     Rejection of Any Net Profits Interests Agreements.  The Plan shall constitute, to the extent necessary, a motion to reject any and all Net Royalty Interests Agreements executed in relation to the Walls 7, 8, 9, 10 or 11. More specifically, without

limiting the prior sentence, the Debtor expressly rejects the the Net Profits Interests Agreements with the Walls NPI Owners.

(c)     General Rejection of Executory Contracts. Unless (i) otherwise specified herein (*i.e.* the Gathering Agreements), (ii) previously assumed by order of the Court, or (iii) designated and identified as an MHI Assigned Contract or MHI Assigned Lease, all executory contracts and unexpired leases are hereby rejected.

(d)     Assumption of Gathering Agreements.  The Debtor expressly assumes the Gathering Agreements.

(e)     Cure of Defaults.   Unless otherwise provided for in the Plan, the Reorganized Debtor shall cure all defaults existing under any assumed Executory Contract pursuant to the provisions of Sections 1123(a)(5)(G) and 365(b) of the Bankruptcy Code, by paying the amount, if any, claimed by such party to such Executory Contract as set forth in a proof of claim, which shall be filed with the Court upon the earlier of (a) 30 days after express notice is given of the Debtor's intent to assume such Executory Contract or (b) within thirty (30) days after the Confirmation Date.  Such proof of claim shall be titled "Assumption Cure Proof of Claim." Alternatively, the Reorganized Debtor may pay such amount as may be agreed upon between the Reorganized Debtor and any party to such Executory Contract, provided an Assumption Cure Proof of Claim is timely filed within thirty (30) days after the Confirmation Date. Payment of any amount claimed in an Assumption Cure Proof of Claim or otherwise agreed to shall be in full satisfaction, discharge and cure of all such defaults (including any other Claims filed by any such party as a result of such defaults), provided, however, that if the Reorganized Debtor files, within thirty (30) days of the filing of an Assumption Proof of Claim, an objection in writing to the amount set forth, the Court shall determine the amount actually due and owing with respect to the defaults or shall approve the settlement of any such Claims. Payment of such Claims shall be made by the Reorganized Debtor on the later of: (i) ten (10) Business Days after the expiration of the thirty day (30) period for filing an objection to any Assumption Cure Proof of Claim filed pursuant to this section; or (ii) when a timely objection is filed, within ten (10) Business Days after an order of the Court allowing such Claim becomes a Final Order.

(f)     Claims for Damages. Unless otherwise specified in a separate Final Order of the Bankruptcy Court, any Claim based upon rejection of an executory contract or unexpired lease under the Plan must be Filed with the Bankruptcy Court and served on the Reorganized Debtor such that the Claim is actually received within thirty (30) days of the Effective Date. Notwithstanding the foregoing, and for the sake of clarity, nothing in this section is meant to modify any prior Order of the Bankruptcy Court related to a rejection of an executory contract or unexpired lease, and to the extent a date is specified in such order, such date shall be the deadline by which Claims based upon rejection must be Filed. All Allowed Claims for rejection damages, unless otherwise specifically provided for or addressed in this Plan, shall be treated as Class 5 General Unsecured Claims.  Any Claim not Filed within such time will be forever barred from assertion against the Debtor and its Estate.

**6.3**    **Effects of Confirmation**

(a)    <u>Discharge</u>.    Except as otherwise provided herein or in the Confirmation Order, any consideration distributed under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor or any of its assets or properties; and except as otherwise provided herein, upon the Effective Date, the Debtor shall be deemed discharged and released to the extent permitted by Section 1141 of the Bankruptcy Code from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or (c) the Holder of the Claim based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor. Except as provided herein, pursuant to Section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Debtor or the property of the Debtor, to the extent it relates to a Claim discharged.

(b)    <u>Legal Binding Effect</u>. On and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims and Equity Interests and their respective successors and assigns, whether or not they accept the Plan. On and after the Effective Date, except as expressly provided in the Plan, all Holder of Claims, Liens and Equity Interests shall be precluded from asserting any Claim, Cause of Action or Liens against the Debtor or the Estate, or their respective property and assets based on any act, omission, event, transaction or other activity of any kind that occurred or came into existence prior to the Effective Date.

(c)    <u>Exculpations</u>. NEITHER THE DEBTOR'S PROFESSIONALS, NOR ANY OF THEIR RESPECTIVE PRESENT OFFICERS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, AFFILIATES, UNDERWRITERS OR INVESTMENT BANKERS, NOR ANY OTHER PROFESSIONAL PERSONS EMPLOYED BY ANY OF THEM (COLLECTIVELY, THE "<u>EXCULPATED PARTIES</u>"), SHALL HAVE OR INCUR ANY LIABILITY TO ANY PERSON FOR ANY ACT TAKEN OR OMISSION IN CONNECTION WITH OR RELATED TO FORMULATING, NEGOTIATING, IMPLEMENTING, CONFIRMING OR CONSUMMATING THE PLAN, THE DISCLOSURE STATEMENT, EXCEPT FOR WILLFUL MISCONDUCT. THE EXCULPATED PERSONS SHALL HAVE NO LIABILITY, EXCEPT FOR WILLFUL MISCONDUCT, TO THE DEBTOR, ANY CREDITOR, ANY EQUITY INTEREST HOLDER, AND ANY OTHER PARTY IN INTEREST IN THE BANKRUPTCY CASE, OR ANY OTHER PERSON FOR ACTIONS TAKEN OR NOT TAKEN UNDER THE PLAN, IN CONNECTION HEREWITH OR WITH RESPECT THERETO, OR ARISING OUT OF THEIR ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN INCLUDING, WITHOUT LIMITATION, FAILURE TO OBTAIN

CONFIRMATION OR TO SATISFY ANY CONDITION OR CONDITIONS, OR REFUSAL TO WAIVE ANY CONDITION OR CONDITIONS, TO THE OCCURRENCE OF THE EFFECTIVE DATE, AND IN ALL RESPECTS SUCH EXCULPATED PERSONS SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.

**6.4     Retention of Jurisdiction**

Under the Plan, notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date of the Plan, the Bankruptcy Court shall retain jurisdiction, to fullest extent legally permitted, over the Bankruptcy Case, all proceedings arising under, arising in or related to the Bankruptcy Case, the Confirmation Order, the Plan and adversary proceedings related to the Bankruptcy Case. Some specific types of disputes and proceedings that the Bankruptcy Court shall retain jurisdiction over are identified in Article XII of the Plan.

**6.5     Procedures for Resolving Disputed, Contingent and Unliquidated Claims**

(a)     Standing.  In addition to all other parties that may otherwise have standing to object to Claims, the Reorganized Debtor shall have specific standing to object to the allowance of said Claims.

(b)     Effect of Bar Date.  In accordance with Bankruptcy Rule 3003(c), any entity, Person or Creditor whose Claim was listed in the Schedules, or holds a Contingent Claim, Unliquidated Claim, or Disputed claims, and did not file a proof of Claim before the Bar Date, shall not be treated as a Creditor with respect to such Claim for purposes of voting or distribution.

(c)     Amendments to Claims; Claims Filed After the Effective Date.  Except as otherwise provided in the Plan, and subject to the Bar Date, a Claim may not be amended after the Effective Date without the prior written authorization of the Bankruptcy Court. Except as otherwise provided in the Plan, any amended Claim Filed with the Bankruptcy Court after the Effective Date shall be deemed Disallowed in full and expunged without the need for any action by the Debtor.

(d)     Objection Deadline.  Within ninety (90) days after the Effective Date, unless such date is extended by Order of the Court after notice and hearing, the Reorganized Debtor may file with the Bankruptcy Court objections to Claims and interests and shall serve a copy of each such objection upon the Holder of the Claim or interest to which such objection pertains, but upon no other party or party-in-interest.  Unless arising from an Avoidance Action, any proof of Claim filed after the Confirmation Date shall be of no force and effect and need not be objected to.  Any Undetermined Claim may be litigated to Final Order. The Reorganized Debtor may compromise and settle any Undetermined Claim without the necessity of any further notice or approval of the Bankruptcy Court, and Bankruptcy Rule 9019 shall not apply to any settlement of an Undetermined Claim after the Effective Date.  Nothing in this Plan extends the Bar Date set in the Bankruptcy Case

or grants any Creditor any greater rights with respect to a late-filed Claim than such Creditor otherwise has.

(e)  Creditor Response to Objection.  With respect to any objection to a Claim when such objection is filed after the Effective Date but otherwise in compliance with this Plan, the Creditor whose Claim was the subject of the objection must file with the Bankruptcy Court and serve a response to the objection upon the Reorganized Debtor and the objecting party no later than thirty (30) days from the date of service of any such objection. Failure to file and serve such a response within the thirty (30) days shall cause the Bankruptcy Court to enter a default judgment against the non-responding Creditor and thereby grant the relief requested in the objection without further notice to such Creditor. Any such objection shall contain prominent negative notice language informing the objected-to creditor of the same.

(f)  No Payment Pending Allowance.  Notwithstanding any other provision in the Plan, if any portion of a Claim is Disputed or is an Undetermined Claim, then no payment or Distribution shall be made on account of any portion of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

(g)  Allowance of Claims.  At the time, and to the extent that a Disputed or an Undetermined Claim becomes an Allowed Claim, such Allowed Claim shall be entitled to such Distributions. Such Distributions shall be made in the manner provided for by this Plan, or any Final Order of the Bankruptcy Court with respect to such Allowed Claim.

(h)  Estimation of Claims.  The Debtor or the Reorganized Debtor may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to 11 U.S.C. § 502(c), regardless of whether the Debtor or the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates an Undetermined Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### ARTICLE VII
### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND SECURITIES LAW CONSIDERATIONS

**7.1**  **Tax**

**THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS. NOTHING IN THIS DISCLOSURE STATEMENT OR IN THE PLAN IS MEANT TO PROVIDE ANY TAX ADVICE TO ANY CREDITORS, INTEREST HOLDER OR PARTY IN INTEREST.**

**7.2**     <u>**Securities**</u>

**PART OF THE CONSIDERATION BEING PAID PURSUANT TO THE MHI SALE INVOLVES THE MHI SHARES, WHICH ARE SHARES IN A PUBLICALLY TRADED COMPANY, MHI. MHI CURRENTLY TRADES ON THE TSX VENTURE EXCHANGE IN TORONTO, CANADA UNDER THE STOCK SYMBOL "MHI", THE FRANKFURT EXCHANGE UNDER THE SYMBOL "N871", AND THE OTC MARKETS AS "MHIFF." THE PLAN AND THE TRANSACTIONS CONTEMPLATED AS A PART OF THE MHI SALE ARE COMPLEX. THERE MAY BE CERTAIN SECURITIES REGULATIONS AND CONSIDRATIONS APPLICABLE TO EACH CREDITOR AND TO PARTIES RECEIVING THE MHI STOCK PURSUANT TO THIS PLAN. CREDITORS AND PARTIES RECEIVING ANY CONSIDERATION UNDER THIS PLAN ARE URGED TO CONSULT THEIR OWN LEGAL COUNSEL AS TO THE CONSEQUENCES OR EFFECT OF RECEIVING THE MHI STOCK. NOTHING IN THIS DISCLOSURE STATEMENT OR IN THE PLAN IS MEANT TO PROVIDE ANY SECURITIES ADVICE TO ANY CREDITORS, INTEREST HOLDER, ANY PARTY IN INTEREST, OR ANY OTHER PERSON WHO MAY RECEIVE DISTRIBUTIONS PURSUANT TO THIS PLAN.**

**ARTICLE VIII**
**<u>FINANCIAL INFORMATION AND PROJECTIONS</u>**

**8.1**     <u>**Financial Information.**</u>

The Debtor believes that the Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code, because Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor. In connection with the planning and development of a plan of reorganization and for purposes of determining whether the Plan will satisfy this feasibility standard, the Debtor has analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtor's management prepared financial projections (collectively, with the reserve information, development schedules, and financial information, the "Financial Projections") for the fiscal years 2018 through 2022 (the "Projection Period"). The Financial Projections are based on a number of assumptions made by management with respect to the future performance of the Reorganized Debtor and MHI NewCo's operations.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMITTION, ANY GUIDELINES GOVERNING SECURITIES IN CANADA, OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTOR, REORGANIZED DEBTOR, AND MHI NEWCO CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTOR AND MHI NEWCO'S FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE FINANCIAL PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ANY AND ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

## 8.2 **General Assumptions**

(a) <u>Methodology</u>. The Debtor's management developed a business plan for the Projection Period based on forecasted production estimates of the Debtor's oil and gas reserves, estimated commodity pricing, estimated future incurred operating, capital expenditures and overhead costs.

(b) <u>Emergence Date</u>. Emergence from Chapter 11 is assumed to occur on or about June 1, 2019.

(c) <u>Operations</u>. These Projections incorporate the Debtor's production estimates and planned revenue reflected in their forecasted capital plan for the Projection Period. The production estimates are based upon management's best efforts to forecast decline curves for their existing proved developed producing wells, as well as drilling and development of new wells during the Projection Period. The actual production from new and existing wells could vary considerably from the assumption used to prepare the production forecasts contained herein.

## 8.3 **Assumptions with Respect to Financial Projections**

(a) <u>Production</u>. Oil and gas production volumes are estimates based on decline curves for existing producing wells scheduled to be drilled during the Projection Period.

(b) <u>Projected Oil Pricing</u>. Commodity pricing is based upon average oil price of $55/Bbl for the rest of 2019, $60/Bbl for 2020 and then $65 for 2021 forward.

(c)　　Production Taxes.  Production taxes are paid on produced oil based on a percentage of market prices and a fixed per unit rates established by federal, state, or local taxing authorities. The Debtor's mid-stream partners automatically deduct those amounts from the production payments it pays the Debtor.

(d)　　Field Operating Costs.  "Field Operating Costs" includes costs incurred to maintain production of the Debtor's oil and gas wells. Such costs include utilities, direct labor, water injection and disposal, materials and supplies, compression, repairs and workover expenses.

(e)　　WI Payments.  Working Interest payments include the amounts paid to the owners of working interest in the Walls Wells related to the Walls 7 Carveout, Walls 8 Carveout, Walls 9 Carveout and Walls 10 Carveout.

(f)　　General and Administrative.　General and Administrative includes overhead, including payroll and benefits for employees, costs of maintaining headquarters, costs of managing production and development operations, franchise taxes, and accounting and professional fees.

(g)　　Senior Note.  This amount includes the principal and interests paid on the New Veritex Note through 2020. Beginning in 2021, the Financial Projections assume that the Debtor will refinance the New Veritex Note with a traditional reserve-based line of credit.

(h)　　Class 5 Note.  This amount includes the quarterly payments made on the Class 5 Note by MHI NewCo and the distribution of those amounts to the Holders of Allowed Class 5 Claims.

(i)　　Drilling and Development.  Drilling and Development includes capital expenditures related to drilling new wells.  The amounts assume drilling of one well every other month for the remainder of 2019 and then increases to one well per month in 2020 forward.

(j)　　Capital Raise.  Capital Raise includes an assumption of certain additional round of financing of approximately $500,000 in late 2019 and early 2020.

**8.4**　　**Summary of Financial Projections**

| | Jun19-Dec19 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Projected Oil Price | $ 55 | $ 60 | $ 65 | $ 65 | $ 65 | $ 65 |
| Oil Sold | 29,040 | 60,555 | 67,650 | 84,645 | 103,620 | 125,565 |
| | | | | | | |
| **Revenue** | | | | | | |
| Oil Revenue | $ 1,228,867 | $ 2,803,689 | $ 3,399,183 | $ 4,261,060 | $ 5,223,066 | $ 6,335,000 |
| OK Production Tax | $ (88,449) | $ (201,799) | $ (244,661) | $ (306,696) | $ (375,937) | $ (455,970) |
| **Net Revenue** | **$1,140,417** | **$2,601,890** | **$3,154,522** | **$3,954,364** | **$4,847,128** | **$5,879,030** |
| | | | | | | |
| **Operating Costs** | | | | | | |
| Field Operating Costs | $ 289,630 | $ 509,080 | $ 533,830 | $ 569,580 | $ 605,580 | $ 641,580 |
| WI Pmts | $ 88,300 | $ 154,334 | $ 149,437 | $ 134,456 | $ 119,476 | $ 104,495 |
| G&A | $ 426,461 | $ 731,076 | $ 731,076 | $ 731,076 | $ 731,076 | $ 731,076 |
| | $ 804,391 | $1,394,490 | $1,414,342 | $1,435,112 | $1,456,131 | $1,477,151 |
| | | | | | | |
| **EBITDA** | **$ 336,027** | **$ 1,207,400** | **$ 1,740,179** | **$ 2,519,252** | **$ 3,390,997** | **$ 4,401,879** |
| | | | | | | |
| **Plan Payments** | | | | | | |
| **Senior Note Payment** | **$ (223,651)** | **$ (383,402)** | **$ (188,782)** | **$ (188,782)** | **$ (188,782)** | **$ (188,782)** |
| **Class 5 Note Payment** | **$ (51,546)** | **$ (99,739)** | **$ (95,268)** | **$ (90,797)** | **$ (86,326)** | **$ (41,486)** |
| | | | | | | |
| **Drilling & Development** | **$ 483,750** | **$ 1,003,245** | **$ 1,306,340** | **$ 1,322,000** | **$ 1,620,843** | **$ 1,575,960** |
| | | | | | | |
| Beginning Cash | $ 250,000 | $ 77,079 | $ 48,092 | $ 197,882 | $ 1,115,555 | $ 2,610,605 |
| Cash from Operations | $ (422,921) | $ (278,987) | $ 149,790 | $ 917,674 | $ 1,495,050 | $ 2,595,651 |
| Capital Raise | $ 250,000 | $ 250,000 | $ - | $ - | $ - | $ - |
| Ending Cash | $ 77,079 | $ 48,092 | $ 197,882 | $ 1,115,555 | $ 2,610,605 | $ 5,206,255 |

## ARTICLE IX
## THE BEST INTERESTS OF CREDITORS TEST

### 9.1     Best Interests of Creditors Test

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interest of all holders of Claims and Equity Interests that are Impaired by the Plan and that have not accepted the Plan as a requirement to confirm the Plan. The "best interests" test, as set forth in section 1129(a)(11) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an Impaired Class of Claims or Equity Interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each Impaired Class of Claims and Equity Interest if the Debtor was liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtor's assets if liquidated in a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to holders of unsecured Claims against the Debtor would be reduced by, first, the claims of secured creditors (to the extent of the value of their collateral), and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the chapter 7 case. Cost of a liquidation of the Debtor under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee and his or her counsel

and other professionals, asset disposition expenses and litigation costs. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution to Holders of Equity Interests.

Under a chapter 7 liquidation, no junior class of Claims or Equity Interests may be paid unless all classes of Claims or Equity Interests senior to such junior class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination is enforceable under applicable non-bankruptcy law. Therefore, no class of Claims or Equity Interests that is contractually subordinated to another class would receive any payment on account of its Claims or Equity Interests, unless and until such senior classes were paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtor's secured and priority creditors, it would then determine the probably distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. As shown in the Liquidation Analysis described in Section 8.2 below, the Debtor believes that each member of each Class of Impaired Claims and Equity Interests will received at least as much, if not more, under the Plan as it would receive if the Debtor was liquidated.

**9.2**     **Liquidation Analysis**

The Debtor believes that under the Plan, all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis is attached hereto as **Exhibit C.**

The Debtor believes that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtor. The Liquidation Analysis provided in **Exhibit C** is solely for the purpose of disclosing to holders of Claims and Interests the effect of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumption set forth therein. There can be no assurance that a bankruptcy court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

**ARTICLE X**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtor believes that the Plan affords holders of Claims and Equity Interests the

potential for the greatest realization on the Debtor's assets and, therefore, is in the best interest of such holders. If, however, enough acceptances received from Classes 1, 2, 3.1, 3.2, 3.3, 4, and 5 sufficient for the Debtor to confirm the Plan are not received, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan or plans, (ii) sale by the Debtor, or (iii) liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

## 10.1    Alternative Plan(s)

If enough acceptances to confirm the Plan are not received or if the Plan is not confirmed, the Debtor (or, if the Debtor's exclusive period in which to file and solicit acceptances of a reorganization plan has expired, any other party in interest) could attempt to formulate and propose a different plan of reorganization or plans of liquidation. However, the Debtor's use of cash collateral is strictly tied to the success of the Plan and the transaction(s) contained in the MHI Sale. As such, if the Plan is not confirmed, the Debtor would likely have to find alternative debtor-in-possession financing to fund its operations and combat the Debtor's secured lender.

Additionally, with respect to an alternative plan, the Debtor has explored various other alternatives to the plan as proposed and the Debtor believes that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## 10.2    Alternative Sale

As described in the Risk Factors below, the Debtor's use of cash collateral is tied to certain "milestones" related to the MHI Sale. In the event that the Debtor or MHI fail to meet those "milestones," the Debtor will be required to retain a Chief Restructuring Officer acceptable to Veritex who will have unfettered authority to sell the Debtor's assets. The Debtor believes that the outcome of a sale under this scenario would result in similar returns and consequences as a chapter 7 liquidation.

## 10.3    Liquidation Under Chapter 7

Proceedings under chapter 7 would impose significant additional monetary and time costs on the Debtor's Estate. Under Chapter 7, a trustee would be elected or appointed to administer the Estate, to resolve pending controversies, including Disputed Claims against the Debtor and Claims of the Estate against other parties, and to make distributions to Holders of Claims. A chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in the Bankruptcy Code, and the trustee would also incur significant administrative expenses. The results of a hypothetical chapter 7 liquidation are included in the Debtor's Liquidation Analysis attached hereto as **Exhibit C.**

## 10.4    Dismissal

Dismissal of the Bankruptcy Case would most likely lead to the same unsatisfactory, or worse, results as a chapter 7 liquidation.

**10.5    Other Alternatives**

The Debtor has attempted to set forth alternatives to the proposed Plan. However, the Debtor must caution Creditors that a vote must be for or against the Plan. The vote on the Plan does not include a vote on alternatives to the Plan. There is no assurance what turn the proceedings will take if the Plan fails to be accepted. If you believe one of the alternatives is preferable to the Plan and you wish to urge it upon the Court, you should consult counsel.

**ARTICLE XI**
**CERTAIN RISK FACTORS TO BE CONSIDERED**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTOR OR THAT THEY CURRENTLY DEEM IMMATERIAL MAY ALSO HARM ITS ESTATE.

**11.1    Cash Collateral Milestones**

As a part of the Debtor's latest round of cash collateral negotiations, it agreed to certain milestones related to the MHI Sale, including: (i) MHI must have, by May 1, 2019, written commitments for private debt placements that will allow MHI to close the MHI Sale by June 1, 2019, and provide a $5,000,000 minimum Cash Proceeds, (ii) the hearing to consider confirmation of the Plan must begin by May 15, 2019, and (iii) the Debtor must close the MHI Sale by June 1, 2019. In the event that the Debtor or MHI fail to meet any of the milestones specified, Veritex has the option to the require the Debtor to appoint a Chief Restructuring Officer who will have unfettered authority to market and sell the Debtor's assets. Immediately upon retention, the CRO shall begin and orderly liquidation of the Debtor's assets.

Although certain risks are always inherent in any milestones or deadlines, the Debtor is confident that it and MHI can meet each of the milestones. MHI engaged two industry leaders (Haywood Capital and Gravitas), which have raised billions of dollars for E&P companies and transactions in recent years. Accordingly, while there is some risk that the Debtor and MHI may not meet one or more of the milestones, such risk is minimized by MHI's use of experienced professionals familiar with oil and gas funding. Further, the Debtor has worked to obtain approval of this Disclosure Statement such that it can solicit acceptance, review objections and begin confirmation within the deadlines specified. In the event that the Plan is confirmed, the Debtor and

MHI are confident that they can close the MHI Sale by the June 1, 2019 deadline. As such, the risk related to the latter two milestones is minimal in the Debtor's estimation.

**11.2    Certain Bankruptcy Law Considerations**

(a)    Objections to Plan and Confirmation

Section 1129 of the Bankruptcy Code provides certain requirements for a Chapter 11 Plan to be confirmed.  Parties-in-interest may object to confirmation of a plan based on an alleged failure to fulfill these requirements or other reasons. The Debtor believes that the Plan complies with the requirements of the Bankruptcy Code. Further, the Debtor has worked to obtain and negotiate consensual treatment with each of the main creditor groups in this case such that any objections to the Plan should be minimal.

(b)    Objections to Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interests is substantially similar to the other claims or interests in such class.

The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each class of Claims and Equity Interests contain Claims or Equity Interests that are substantially similar to the other Claims and Equity Interests in each such class.

(c)    Insufficient Acceptances

For the Plan to be confirmed, each Impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to such Impaired voting Classes, the Plan will be deemed accepted by a Class of Impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Debtor intends to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan. However, there can be no assurance that any Impaired Class of Claims under the Plan will accept the Plan or that the Debtor would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

(d)    Claims Estimation

There can be no assurance that the estimated amount of Claims and Equity Interests are correct, and the actual Allowed amounts of Claims and Equity Interests may differ from estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions.  Should one or more of these risks or uncertainties materialize or should

underlying assumptions prove incorrect, the actual Allowed amounts of Claims and Equity Interests may vary from those estimated therein. However, in terms of numbers of claims, there is a relatively small amount of Claims. Further, the Debtor is in constant contact with a number of the vendors who constitute the majority of the Unsecured Claims and thus the Debtor are confident in their estimates and assumptions.

**11.3    Estimated Recovery Risks**

The Plan will be funded through Cash on hand, the Sale Proceeds and payments over time from the Reorganized Debtor from both operations and payments on the Class 5 Note. There is a risk that MHI NewCo may fail to make the payments on the Class 5 note, which would affect the Distributions to Class 5 Creditors.

Although no guarantees can be made about the exact future performance of MHI NewCo, the Debtor has anticipated the future financial performance and business operations of MHI NewCo, and believes that it will be able to fund and pay all obligations required by the Plan, including all future operational expenses, taxes and other ongoing obligations. Creditors are urged to consider and review the Financial Projections in Article VIII of this Disclosure Statement.

**ARTICLE XII**
**VOTING PROCEDURES AND REQUIREMENTS**

**12.1    Voting Deadline**

Each Creditor holding a Claim which entitles the Creditor to vote on the Plan has been provided a Ballot along with this Disclosure Statement. If a Creditor holds Claims in more than one Class entitled to vote under the Plan, the Creditor may indicate his vote in each Class with the same Ballot, or the Creditor may request an additional Ballot for each additional Class it is entitled to vote. The Ballot is to be used by the Creditor to accept or reject the Plan and to make any elections that are available to the Creditor as indicated by the Ballot.

To ensure that a Ballot is deemed timely and considered by the Balloting Agent, which shall be the Debtor's attorneys, Pronske & Kathman, P.C., a Creditor must: (a) carefully review the Ballot and the instructions set forth thereon; (b) provide all of the information requested on the Ballot; (c) sign the Ballot; and (d) return the completed and signed Ballot to the Balloting Agent by the Voting Deadline. By order of the Bankruptcy Court, the "Voting Deadline" is 4:00 p.m. (CST), on _____, 2019. Therefore, in order for a Ballot to be counted for voting purposes and any applicable election, the completed and signed Ballot must be received at the address specified below by no later than the Voting Deadline.

DEADLINE:   Must be **RECEIVED** by 4:00 p.m., Central Time
on _____, 2019

Addressed to:
Pronske & Kathman, P.C.
Attn: Jason P. Kathman
2701 Dallas Pkwy., Suite 590

Plano, Texas 75093
Facsimile: 214.291.2665

## 12.2    Creditors Solicited to Vote

Each Creditor holding a Claim in a Class that is Impaired under the Plan is being solicited to vote on the Plan. As to any Claim for which a proof of claim was filed and as to which an objection has been lodged, however, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to the extent the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount determined by the Bankruptcy Court. Such motion must be heard and determined by the Bankruptcy Court prior to the date and time scheduled by the Bankruptcy Court for a hearing determining the confirmation of the Plan. Further, the Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provision of the Bankruptcy Code.

## 12.3    Definition of Impairment

Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims is Impaired under a Plan unless, with respect to each Claim of such Class, the plan does at least one of the following two (2) things:

1.    leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim; or

2.    notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:

   (a)    cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

   (b)    reinstates the maturity of such claim as it existed before the default;

   (c)    compensates the holder of such Claim for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

   (d)    does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder of such Claim.

The Plan identifies the classes of Creditors and Interests that the Debtor believe are Impaired or unimpaired under the Plan. The Plan cannot and does not change the law on what is an Impaired class and, to the extent a Creditor disagrees with the Debtor's identification of Impaired or unimpaired classes, the Creditor may object to the Plan and the Bankruptcy Court will

decide the dispute.

### 12.4    Classes Impaired Under the Plan

Classes 1, 2, 3.1, 3.2, 3.3, 4, 5, 6 and 7 of the Plan are Impaired. Therefore, the Holders of Claims in those Classes are being solicited for votes in favor of the Plan; *provided, however,* the votes in Classes 6 and 7 will not counted toward satisfaction of section 1129(a)(10).

With respect to the foregoing, the Debtor specifically reserves its right to determine and contest, if necessary: (a) the Impaired or unimpaired status of a Class under the Plan; and (b) whether any Ballots cast by Creditors holding Claims within such a class should be counted for purposes of confirmation of the Plan.

### 12.5    Votes Required for Class Acceptance

Pursuant to the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-third (2/3) in amount and more than half (1/2) in number of the Claims within such Class who are entitled to vote and who actually vote using a properly completed and signed Ballot which is returned to the Balloting Agent by no later than the Voting Deadline.  It is important to note that, pursuant to the Bankruptcy Code, a Class vote in favor of the Plan will be binding even on those creditors in the Class who vote against the Plan, so long as the requisite voting percentages are obtained in favor of the Plan.

### 12.6    Specific Considerations in Voting

While the Plan provides for certain payments at Confirmation, such payments will only apply to Allowed Claims including Claims arising from defaults. Under the Bankruptcy Code, a Claim may not be paid until it is Allowed. A Claim will be Allowed in the absence of objection.

A Claim, including a Claim arising from default, which has been objected to will be heard by the Court at a regular, evidentiary hearing and Allowed in full or in part or disallowed. While the Debtor bears the principal responsibility for Claim objections, any interested party, including Creditors, may file claim objections. Accordingly, payment on some Claims, including Claims arising from defaults, may be delayed until objections to such Claims are ultimately settled. Parties should also read and consider the risk factors discussed and analyzed in Article XI of this Disclosure Statement.

## XIII.  MISCELLANEOUS PROVISIONS

### 13.1    Disclosures Required by the Bankruptcy Code

The Bankruptcy Code requires disclosure of certain facts:

1)       There are no payments made or promises of the kind specified in section 1129(a)(4) of the Bankruptcy Code which have not been disclosed to the Court.

2)    Counsel to the Debtor has advised the Debtor that the Debtor will require legal services in connection with this case after confirmation which will require reimbursement.  Debtor may continue to use Pronske & Kathman, P.C., as counsel after confirmation.

**13.2.   Certain Rights Unaffected**

Except as otherwise provided in the Plan, any rights or obligations which the Debtor's Creditors may have amongst them as to their respective claims or the relative priority or subordination thereof are unaffected.

**13.3   Binding Effect**

As of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized Debtor, the Holders of the Claims, and their respective successors and assigns.

**13.4   Notices**

All notices, requests or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing, provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following parties, addressed to:

**Debtor:**

Fulcrum Exploration, LLC
3700 River Walk Drive
Suite 175
Flower Mound, Texas. 75028

**Debtor's Counsel:**

Jason P. Kathman
Brandon J. Tittle
Pronske & Kathman, P.C.
2701 Dallas Pkwy., Suite 590
Plano, Texas 75093
(214) 658-6500 - Telephone
(214) 291.2665 – Facsimile

All notices and request to holders of Claims and Interests shall be sent to them at the

address listed on the last-filed proof of claim and if no proof of claim is filed, at the address listed in the Debtor's Schedules.

        13.5    <u>Injunctive Relief</u>

        **EXCEPT AS PROVIDED HEREIN, ON AND AFTER THE CONFIRMATION DATE, ALL CREDITORS AND PERSONS ACTING IN CONCERT WITH THEM ARE ENJOINED AND RESTRAINED PURSUANT TO SECTION 105 OF THE CODE FROM TAKING ANY ACTION TO CORRECT OR ENFORCE ANY CLAIM DIRECTLY OR INDIRECTLY AGAINST THE REORGANIZED DEBTOR IN ANY MANNER INCONSISTENT WITH THE TERMS CONTAINED IN THE PLAN. THE DISCHARGE GRANTED BY THE PLAN VOIDS ANY JUDGMENT AT ANY TIME OBTAINED WITH RESPECT TO ANY DEBT DISCHARGED.**

**RECOMMENDATION AND CONCLUSION**

        The Debtor respectfully submits that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest of creditors" and "feasibility" requirements and that it should be confirmed even in the event a class of claims does not vote for acceptance of the Plan.  The Debtor believes that the Plan "is fair and equitable" and "does not discriminate unfairly." Additionally, the Debtor believes that the Plan has been proposed in good faith.

        For all of the reasons set forth in this Disclosure Statement, the Debtor believes that Confirmation and consummation of the Plan is preferable to all other alternatives discussed herein. Consequently, the Debtor urges all Holders of Claims to vote to accept the Plan, and to complete and return their Ballots so that they will be received by the Balloting Agent on or before the Voting Deadline.

Dated: February 18, 2019

                               **FULCRUM EXPLORATION LLC**

                               By:    */s/ Derek Jensen*
                                      Name: Derek Jensen
                                      Title:   President

OF COUNSEL:

Jason P. Kathman
State Bar No. 24070036
Brandon J. Tittle
State Bar No. 24090436
PRONSKE & KATHMAN, P.C.
2701 Dallas Pkwy, Suite 590
Plano, Texas 75093
(214) 658-6500 - Telephone
(214) 658-6509 – Telecopier
Email: jkathman@pgkpc.com
Email: btittle@pgkpc.com